IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEFFREY ANTHONY,                  :
                                  :
        Plaintiff                 :
                                  :
    v.                            :      CIVIL NO. 3:13-CV-02088
                                  :
CAROLYN W. COLVIN, ACTING         :      (Judge Kane)
COMMISSIONER OF SOCIAL            :
SECURITY,                         :
                                  :
        Defendant                 :

## MEMORANDUM

Plaintiff Jeffrey Anthony has filed this action seeking review of a decision of the Commissioner of Social Security ("Commissioner") denying Anthony's claim for social security disability insurance benefits and supplemental security income benefits.  (Doc. 1).

Disability insurance benefits are paid to an individual if that individual is disabled and "insured."  Anthony met the insured status requirements of the Social Security Act through December 31, 2014.  Tr. 15.  In order to establish entitlement to disability insurance benefits Anthony was required to establish that he suffered from a disability on or before that date.  42 U.S.C. § 423(a)(1)(A).

## I.    BACKGROUND

Anthony protectively filed his applications for supplemental security income benefits and disability insurance benefits on November 12, 2010 and November

22, 2010 respectively, claiming that he became disabled on March 22, 2010.  Tr.

13, 134.  Anthony has been diagnosed with several impairments, including:

Hypokalemia, Duodenitis, Esophagitis, Hyperlipidemia, Major Depressive

Disorder, Anxiety Disorder, Attention Deficit-Hyperactivity Disorder ("ADHD"),

Dyslexia, Auditory Processing Disorder, and Borderline Normal/Mild Intellectual

Deficiencies.  Tr. 15-16.  On January 26, 2011, Anthony's applications were

initially denied by the Bureau of Disability Determination.  Tr. 90.

On January 31, 2011, Anthony requested a hearing before an administrative

law judge ("ALJ").  Tr. 76.  The ALJ conducted a hearing on January 10, 2012,

where Anthony was represented by counsel.  Tr. 30-60.  On March 9, 2012, the

ALJ issued a decision denying Anthony's applications.  Tr. 13-23.  On June 3,

2013, the Appeals Council declined to grant review.  Tr. 1.  Anthony filed a

complaint before this Court on August 5, 2013, and this case became ripe for

disposition on February 20, 2014, when Anthony declined to file a reply brief.

(Docs. 1, 16, 17).

Anthony appeals the ALJ's determination on three grounds: (1) the ALJ

erred in failing to explain how Anthony's hypokalemia was accounted for in the

residual functional capacity determination, (2) the ALJ failed to give appropriate

weight to the opinion of Anthony's treating physician, and (3) the ALJ improperly

2

discounted Anthony's credibility.  (Doc. 16).  For the reasons set forth below, the

decision of the Commissioner is affirmed.

II.   **STATEMENT OF RELEVANT FACTS**

Anthony was thirty-seven years of age at the time of the ALJ's decision, has

obtained a GED, and is able to read, write, speak, and understand the English

language.  Tr.  31-32, 153.  Anthony's past relevant work included work as a stores

laborer, which is classified as medium, unskilled work, as a landscape laborer,

which is medium, unskilled work, and as a forklift operator, which is medium,

semi-skilled work.  Tr. 55.

A.   **Anthony's Hypokalemia**

Prior to the relevant period, on July 22, 2009, Anthony presented to the

Carlisle Regional Medical Center with complaints of severe muscle weakness and

diarrhea.  Tr. 304.  Anthony was found to have severe hypokalemia (low potassium

levels) with a potassium level of 1.8;[1] he was treated with potassium supplements.

Tr. 304, 306.  With correction of the hypokalemia, Anthony's "muscular weakness

improved dramatically."  Tr. 304.  Within twenty-four hours Anthony's potassium

levels had risen to 3.3, his muscle strength was normal, and he was able to

ambulate under his own power.  Id.  The etiology of Anthony's hypokalemia

remained unknown, and Gregory Lewis, M.D. opined that the diarrhea likely was

---

[1] Normal potassium levels fall between 3.5 and 5.0.  Tr. 291.

not severe enough or frequent enough to cause Anthony's condition.  Tr. 217.

Furthermore, Dr. Lewis noted that Anthony's "pattern of stooling [remained]

unchanged since childhood" and Anthony had never sought treatment for that

condition.  Tr. 216.

On August 25, 2009, Anthony was examined by Kevin Scott, M.D.  Tr. 362.

Dr. Scott noted that there had been no repeat episodes of muscle strength loss in

the previous month, though Anthony reported several episodes of mild muscle

weakness.  Id.  Anthony had a normal gait, normal reflexes, and a normal physical

and neurological examination.  Tr. 363.  Dr. Scott diagnosed Anthony with

"[e]pisodic muscle weakness secondary to hypokalemia" but opined that the

"presentation is suggestive of hypokalemic periodic paralysis."  Tr. 364.

On June 23, 2010, Anthony was referred to Navin Verma, M.D. for an

evaluation.  Tr. 370-72.  Dr. Verma noted that Anthony had been on potassium

supplements since July 2009, and his "more recent [potassium] levels [were] in

normal range."[2]  Tr. 370.  Anthony reported occasional visual changes, diarrhea,

and muscle cramps.  Tr. 371.  A physical examination was normal, and Anthony

was grossly intact neurologically.  Id.  Dr. Verma's impression was of one episode

of hypokalemia, possibly due to dehydration or gastrointestinal losses.  Id.  Urine

---

[2] Blood tests revealed that Anthony's potassium levels were within the normal range on July 30, 2009, January 5, 2010, April 13, 2010, May 10, 2010, May 21, 2010, and June 25, 2010.  Tr. 291.  His potassium level was slightly low on March 19, 2010, with a level of 3.4.  Id.

collection had not revealed any potassium wasting; Dr. Verma was unable to

uncover any significant etiology, and recommended a high potassium diet.  Id.

On August 22, 2011, Anthony presented to the Sadler Health Corporation

with complaints of muscles aches, as well as leg and hip pain.  Tr. 433.  His

potassium level was slightly low at 3.2,[3] and he was encouraged to eat grapes and

bananas.  Id.  On September 28, 2011 and October 6, 2011, Anthony's potassium

levels remained normal.  Tr. 430.  Anthony reported some pain in his lower

extremities, but took twenty-four potassium pills which "helped."  Id.

On December 4, 2011, Anthony presented to the emergency room with

complaints of leg weakness and an inability to walk.  Tr. 474.  Anthony was able to

lift his legs, although he was unable to stand or ambulate at the time of admittance.

Tr. 476.  His potassium level was 1.9 and he was diagnosed with hypokalemia.  Tr.

474, 476.  Gabriel Gabason, M.D. opined that further observation was needed to

determine the etiology of the hypokalemia.  Tr. 477.  By December 5, Anthony's

potassium levels had increased to 3.1, and upon discharge on December 6, his

potassium levels were normal at 4.1.  Tr. 480, 496.

### B.    Anthony's Mental Impairments

On April 2, 2010, Anthony presented to William Thomas, M.S. for a

psychological evaluation.  Tr. 218.  Dr. Thomas administered a Wechsler Adult

---

[3] Prior thereto, on June 6, 2011, Anthony's potassium level tested at a normal level of 3.7.  Tr. 451.

Intelligence Scale – III test; Anthony scored seventy-eight on the verbal IQ portion, ninety-two on the performance IQ portion, and had a full scale IQ of eighty-four. Id. Dr. Thomas noted that Anthony "presented as a friendly [and] amicable individual with whom rapport was readily established." Tr. 219. He answered questions directly in a frank and sincere manner, and "cooperated to the best of his abilities with all expectations." Id.

Dr. Thomas opined that Anthony's IQ scores were indicative of "[b]orderline normal/mildly retarded everyday adjustment and/or functioning[.]" Tr. 220. Anthony had average innate cognitive endowment with a likely presence of ADHD and a likely learning disability. Id. He was diagnosed with ADHD, Borderline Normal/Mild Intellectual Difficulties, Dyslexia, and Auditory Processing Disorder. Tr. 221. Dr. Thomas recommended dyslexic intervention, cognitive/behavioral intervention, and psychostimulants to treat ADHD. Id.

Between April and June 2010, Anthony sought treatment from Kelly Caruso, M.D. Tr. 250-53, 262-64. Anthony consistently had a normal mood and affect, was alert and oriented, and had intact immediate and remote memory. Id. His judgment was realistic and his insight was appropriate. Id.

On June 23, 2010, Anthony presented to the Northwestern Human Services Stevens Center ("Stevens Center"). Tr. 234. Anthony had normal speech, an appropriate appearance, clear and coherent thought processes, and appropriate

thought content.  Id.  His mood and affect were depressed, but he was oriented and had adequate memory.  Id.  Anthony was cooperative, had a positive attitude, and good daily functions.  Tr. 235.  He was diagnosed with Adjustment Disorder with anxiety and a depressed mood, and was assigned a GAF score of fifty.[4]  Id.

On September 1, 2010, Anthony was examined by Mohammad Ikram, M.D. in relation to his mental impairments.  Tr. 376.  Anthony reported being depressed for most of his life, and reported chronic sadness, occasional crying, isolation, irritability, and an inability to relax.  Tr. 377.  Dr. Ikram noted that Anthony was somewhat unkempt and disheveled, restless, and became distracted from time to time.  Tr. 378.  He made good eye contact, had no abnormal movements, and had mostly coherent speech.  Id.  Anthony had a depressed mood and a sad and anxious affect, but a goal-directed thought process with some circumstantiality.  Id.  He was alert and oriented, had adequate insight and judgment, reported no suicidal or homicidal thoughts, and no hallucinations or delusions.  Tr. 378-79.  Dr. Ikram started Anthony on Zoloft and trazodone, continued Concerta at the current dose for ADHD, and recommended that Anthony continue with therapy.[5]  Tr. 379.

---

[4] A GAF score of 41–50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) [or] any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

[5] Records indicate that Anthony attended therapy sessions with Rose Holland, LPC five times between August 2010 and September 2010.  Tr. 380-84.

On September 15, 2010, Anthony continued to have a disheveled appearance and poor hygiene. Tr. 374. He was irritable with an anxious mood and appropriate affect, though he had improved attention and concentration. Id. His memory was intact, his thought processes were coherent, and he had no suicidal or homicidal thoughts. Id. Anthony reported that he had not taken his medication for four days. Id. Dr. Ikram decreased Anthony's dose of Zoloft. Id.

On September 22, 2010, Anthony reported being compliant with his medications. Tr. 373. His anger had subsided, he experienced appropriate emotions, reported that therapy was "beneficial," and both Anthony and his wife reported noticing an improvement on the new dose of Zoloft. Id. Anthony had a normal appearance and good hygiene. Id. His mood was euthymic, his affect was appropriate, his memory was intact, he had no suicidal or homicidal thoughts, and no hallucinations or delusions. Id.

On November 10, 2010, Anthony presented for a psychiatric evaluation at the Stevens Center. Tr. 420. Anthony reported mood swings, depression, crying, feelings of hopelessness and helplessness, suicidal ideation, and poor concentration. Id. He also reported an angry and explosive mood, hypersexuality, paranoia, and irrationality. Id. Although Zoloft was "somewhat helpful," it was noted that he was not taking his medications regularly. Tr. 421.

Anthony was cooperative and there was no evidence of psychomotor agitation or retardation.  Tr. 422.  He had a euthymic mood with an appropriate affect, and clear thoughts with some paranoia.  Id.  There was no evidence of any gross cognitive deficit, and Anthony was insightful with no hallucinations or suicidal ideation.  Id.  He was diagnosed with Bipolar II disorder, a past history of ADHD, and borderline intellectual functioning.  Id.  Anthony was assigned a GAF score of forty-eight and was recommended for a partial hospitalization program four days per week.  Id.

On April 15, 2011, Anthony presented to Henry Wehman, M.D., Ph.D. for a medication review.  Tr. 418.  Anthony had a "grubby" appearance but his mental impairments were stable.  Id.  He had relevant, productive, and goal-directed speech, a normal stream of thought, and normal content of thought.  Id. Anthony had a depressed mood and constricted affect, but denied suicidal or homicidal thoughts and denied hallucinations.  Id.  Dr. Wehman assigned a GAF score[6] of sixty[7] and prescribed Zoloft and Adderall.  Id.

---

[6] Dr. Wehman submitted a note to the administrative law judge indicating that he based his GAF scores on psychiatric signs and symptoms, "not necessarily social and occupational functioning." Tr. 517.  Consequently, Dr. Wehman stressed that the GAF score was more useful in determining Anthony's mental state and medication management than determining his ability to work.  Id.

[7] A GAF score between 51 and 60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or co-workers)."  Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

On May 16, 2011, Anthony reported to physicians at Sadler Health Corporation that he was "doing pretty good [sic] on Geodon 40 mg BID, Adderall 5mg a day and Zoloft 50mg a day." Tr. 443. Anthony stated that he was "doing much better" than he had been in the past. Id.

On June 6, 2011, Anthony returned to Dr. Wheman for a medication review. Tr. 417. He had relevant, productive, and goal directed speech, as well as a normal stream of thought and normal content of thought. Id. His mood was euthymic, his affect was normal, he had intact cognitive functions, and he denied suicidal or homicidal thoughts or hallucinations. Id. Dr. Wehman assigned a GAF score of seventy[8] and increased Anthony's Adderall prescription. Id. On September 12, 2011, Anthony reported that his medications were helping with his anxiety, but he felt more depressed overall. Tr. 416. Dr. Wehman assigned a GAF score of sixty and increased Anthony's dose of Zoloft. Id.

### C.    Residual Functional Capacity Assessments

On January 6, 2011, Francis Murphy, Ph.D. reviewed Anthony's medical records and completed a mental residual functional capacity assessment. Tr. 388-

---

[8] A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning fairly well with some meaningful interpersonal relationships. See, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., Text rev., 2000).

403.  Dr. Murphy opined that Anthony was moderately limited[9] in his ability to: (1) understand, remember, and carry out detailed instructions, (2) maintain attention and concentration for extended periods, (3) sustain an ordinary routine without special supervision, and (4) interact appropriately with the general public.  Tr. 388-89.  Dr. Murphy later clarified that Anthony

> can perform simple, routine, repetitive work in a stable environment. He could be expected to complete a normal workweek without exacerbation of psychological symptoms.  He is capable of asking questions and accepting instructions.  He would be able to make simple decisions.  He retains the ability to perform repetitive work activities without constant supervision.

Tr. 390.

Dr. Murphy further opined that Anthony had only mild restrictions in his activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties maintaining concentration, persistence, or pace.  Tr. 401.  He diagnosed Anthony with ADHD, adjustment disorder with a depressed and anxious mood, and borderline intellectual functioning.  Tr. 403.

On December 12, 2011, Dr. Wehman completed a mental residual functional capacity assessment.  Tr. 513-15.  He opined that Anthony had extreme limitations[10] in his ability to: (1) understand, remember, and carry out simple

---

[9] The form completed by Dr. Murphy did not define moderate.  Elsewhere in the administrative record, moderate is defined as "[t]here is more than a slight limitation in this area but the individual is still able to function satisfactorily."  Tr. 513.

[10] Extreme was defined as "[t]here is a major limitation in this area.  There is no useful ability to function in this area."  Tr. 513.

instructions, (2) make judgments on simple work-related decisions, (3) understand, remember, and carry out complex instructions, (4) make judgments on complex work-related decisions, (5) interact appropriately with the public, supervisors, or co-workers, and (6) respond appropriately to usual work situations and to changes in a routine work setting.  Tr. 513-14.  Dr. Wehman stated that these limitations were based upon Anthony's partial hospitalization program, and "[w]hen depressed [and] anxious [Anthony] can do none of these things."  Id.

### D.   The Administrative Hearing

On January 10, 2012, Anthony's administrative hearing was conducted.  Tr. 30-60.  At that hearing, Anthony testified that he lived with his wife and two disabled children; he was responsible for making dinner and helping with household chores.  Tr. 32-33.  Anthony stated that he occasionally had difficulty performing chores when his potassium levels were low, but was able to drive, even on days when his potassium was low.  Tr. 33, 44-45.

On a typical day, Anthony described barely being able to stay awake during the day.  Tr. 36.  He woke up at 5:30 a.m., saw his children off to school, then slept again until 11 a.m.  Tr. 36-37.  Thereafter, Anthony would sometimes make lunch and care for personal hygiene, and then would spend the afternoon with his wife trying "to get the kids' messes cleaned up."  Tr. 37.  He would nap at 5:00 p.m. for one to two hours, and then prepare dinner.  Tr. 39-40.  After dinner, he would help

his children with homework if they required help, then go to bed at 8:00 p.m.  Tr.

38.  Anthony admitted that he had previously been convicted of welfare fraud, and

had been receiving unemployment compensation.  Tr. 35-36, 40.

Anthony was seeing Dr. Wehman every three months, and had just started

seeing a counselor after being suspended from those services for missing too many

appointments.  Tr. 34.  Anthony stated that his partial hospitalization program had

helped with his mental impairments.  Tr. 35.  He further testified that Geodon and

Klonopin "seem[ed] to be" helping, although Geodon made him tired.  Tr. 39.

Anthony later reiterated that he was still having some mental "problems at times

but the medications seem to be helping me."  Tr. 50.  He reported that he had only

been hospitalized twice for low potassium, though he had physical problems due to

low potassium that did not require hospitalization.  Tr. 42.  Anthony stated that low

potassium interfered with his ability to walk, his ability to use his hands, and

occasionally interfered with his eyesight.  Tr. 43.  He alleged suffering from low

potassium once or twice per week, and stated that it would take one or two days

before he returned to normal functioning.  Tr. 43-44.

After Anthony testified, Sheryl Bustin, an impartial vocational expert, was

called to give testimony.  Tr. 53.  The ALJ asked Ms. Bustin to assume a

hypothetical individual who was limited to light work[11] but could only stand for one-third of the day and must change positions from sitting to standing every half hour.  Tr. 56.  Furthermore, the hypothetical individual was limited to unskilled, simple, routine, repetitive work that did not require precise attention to detail.  Id.

Ms. Bustin opined that this hypothetical individual would not be able to perform Anthony's past relevant work.  Id.  However, the individual would be capable of performing three other jobs that exist in significant numbers in the national economy: conveyor line bakery worker, laminating machine tender, and dowel inspector.  Tr. 56-57.  Ms. Bustin testified that if an individual would miss work once every two weeks, he would be unable to maintain substantially gainful employment.  Tr. 58.  Furthermore, if Dr. Wehman's opinion were taken as true, Anthony would not be able to engage in substantially gainful employment. Id.

## III.  **DISCUSSION**

In an action under 42 U.S.C. § 405(g) to review the Commissioner's decision denying a plaintiff's claim for disability benefits, the district court must uphold the findings of the Commissioner so long as those findings are supported

---

[11] Light Work is defined by the regulations of the Social Security Administration as work "with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 416.967.

by substantial evidence.  Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  In an adequately developed record substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter v. Harris, 642 F.2d 700, 706 (3d Cir. 1981), and "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence.  Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993).  The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence.  Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 203 (3d Cir. 2008).

Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir. 1981).

The Commissioner utilizes a five-step process in evaluating disability insurance benefits claims.  See 20 C.F.R. § 404.1520; Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 91-92 (3d Cir. 2007).  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work, and (5) if not, whether he or she can perform other work in the national economy.  See 20 C.F.R. § 404.1520.   The initial burden to prove disability and inability to engage in past relevant work rests on the claimant; if the claimant meets this burden, the burden then shifts to the Commissioner to show that a job or jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  Mason, 994 F.2d at 1064.

### A.    Physical Limitations Resulting from Hypokalemia

Anthony first argues that the ALJ erred in his residual functional capacity determination as it related to Anthony's hypokalemia.  (Doc. 16).  Specifically, he argues that the ALJ did not specify whether the residual functional capacity

16

represents Anthony's limitations during an exacerbation of hypokalemia or during a period of time when Anthony is not affected by hypokalemia.

A claimant's residual functional capacity "is not the least an individual can do despite his or her limitations or restrictions, but the most." SSR 96-8p. When reaching a residual functional capacity determination, the ALJ must consider all relevant medical evidence and give some indication of what evidence was rejected, along with a satisfactory explanation for why the evidence was rejected. Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000).

Here, the ALJ adequately explained his residual functional capacity determination. The ALJ recognized that Anthony had presented to doctors several times complaining of muscle pain, lower extremity weakness, and difficulty ambulating. Tr. 19. The ALJ also acknowledged that blood work occasionally revealed low potassium levels. Id. However, the ALJ found that Anthony was not as limited physically as he stated. Id.

The ALJ believed that two factors weighed against greater physical limitations than those contained in the residual functional capacity determination. First, the ALJ noted that Anthony's activities of daily living "suggest a greater degree of functioning than alleged." Id. Specifically, the ALJ found that Anthony's self-reported ability to prepare full meals for his family, travel independently, spend time with his family, perform household chores, and mow

17

the lawn belied his claims of nearly total incapacity during bouts of hypokalemia. Id. Second, the ALJ noted that the medical evidence did not support Anthony's claims. Tr. 20. Specifically, the ALJ observed that Anthony's treatment for hypokalemia had been conservative in nature, consisting entirely of supplements and prescription medications. Id. The medical records also revealed complaints of muscle weakness at a time when Anthony's potassium levels were normal. Id.

Of further importance is the fact that, prior to his alleged onset date, Anthony engaged in work with a medium exertional level. Tr. 55. The administrative record reveals that Anthony continued to perform medium exertional work into the first quarter of 2010, approximately six months after he was hospitalized for hypokalemia. Tr. 141, 216. The logical conclusion is that Anthony maintained a physical ability to perform work of at least a light exertional level even when suffering from low potassium levels.

Furthermore, no doctor ever opined that Anthony's hypokalemia was a chronic issue that was expected to last for twelve continuous months. Dr. Verma noted in June 2010, that Anthony had only suffered from a single episode of hypokalemia. Tr. 371. During the relevant period, Anthony only experienced one episode of hypokalemia that required medical treatment. Tr. 474. During the one year and ten months after Anthony's alleged onset date, blood tests revealed low potassium on only three occasions; on two of these occasions his potassium levels

18

were only slightly diminished.  Tr. 291, 433, 474.  Thus, blood tests do not

document the chronic condition that Anthony reported.

Finally, it is significant that no doctor ever opined Anthony was more

limited physically than the ALJ found him to be.  See, Burns v. Barnhart, 312 F.3d

113, 129 (3d Cir. 2002) ("Importantly, [the claimant] does not point to any relevant

medical opinion that supports his allegation that his pain and exertional limitations

are more severe than the ALJ found them to be").  Consequently, the ALJ

adequately accounted for all physical limitations, and the evidence supports the

conclusion that the residual functional capacity determination accounts for

Anthony's functional abilities on a continuing basis for five days each week.

## B.    Evaluation of the Medical Opinion Evidence

Anthony also challenges the ALJ's decision to give little weight to the

opinion of Dr. Wehman, his treating physician.  (Doc. 16).  Anthony contends that

the ALJ did not adequately explain his decision to give little weight to Dr.

Wehman, while simultaneously giving significant weight to the opinion of Dr.

Murphy, a non-treating, non-examining physician.

### i.    *Dr. Wehman's Opinion*

The preference for the treating physician's opinion has been recognized by

the United States Court of Appeals for Third Circuit.  Morales v. Apfel, 225 F.3d

310, 316-18 (3d Cir. 2000).  When the treating physician's opinion conflicts with a

non-treating, non-examining physician's opinion, the ALJ may choose whom to credit, but "cannot reject evidence for no reason or for the wrong reason." Id. at 317 (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)).

The ALJ considered Dr. Wehman's opinion, but gave that opinion "little weight," reasoning that the "extreme findings" were inconsistent with Dr. Wehman's own clinical observations, Anthony's routine and conservative treatment, and his own reported activities of daily living. Tr. 21.

The ALJ correctly noted that Dr. Wehman's findings were inconsistent with his own clinical observations. For example, Dr. Wehman found that Anthony had intact cognitive functions and showed no signs of any cognitive deficit. Tr. 418, 422. Anthony had a normal stream of thought and normal thought content, as well as relevant, productive, and goal-directed speech. Tr. 417-18. Despite stating that Anthony could not make judgments on simple work-related matters, Dr. Wehman believed that Anthony was insightful, and Dr. Caruso consistently noted that Anthony had intact judgment and insight. Tr. 251, 253, 263, 422. Dr. Ikram also noted that Anthony had adequate insight and judgment. Tr. 379

Dr. Wehman opined that Anthony could not remember simple instructions when he was depressed and anxious, but previously noted that there was no evidence of psychomotor agitation or retardation at a time when Anthony reported

depression.  Tr. 420-22.  Dr. Ikram opined that Anthony had intact memory and improved concentration and attention despite an anxious mood.  Tr. 374.

Furthermore, the ALJ did not err in finding that Anthony's conservative treatment belied his complaints of debilitating symptoms.  Tr. 21.  Anthony was consistently treated with only medication and, despite reporting improvement with therapy, Anthony elected to attend only five therapy sessions during the relevant period.  Tr. 373, 380-84.  Additionally, although Anthony reported improvement with medication, doctors twice noted that Anthony often failed to comply with his medication regimen.  Tr. 373, 374, 416, 421, 443.

Finally, the ALJ was correct in his assertion that Anthony's activities of daily living were inconsistent with Dr. Wehman's extreme limitations.  Tr. 21. The ALJ noted that Anthony reported an ability to get along with his household members and was cooperative and generally pleasant with his treatment providers. Tr. 19.  This indicates that Anthony was not markedly limited in his ability to get along with co-workers, supervisors, and the general public as Dr. Wehman opined. Tr. 19, 514.  Anthony was able to cook "full course meals" for his family, clean, do the laundry, mow the lawn, and help his children with their homework if they required help.  Tr. 38, 164.  These activities indicate that, contrary to Dr. Wehman's opinion, Anthony had at least some functional ability to maintain

attention and concentration.  Consequently, substantial evidence supported the ALJ's decision to assign limited weight to Dr. Wehman's opinion.

     ii.    *Dr. Murphy's Opinion*

Anthony also argues that the ALJ erred in her reliance on Dr. Murphy's opinion.  (Doc. 16).  Anthony contends that Dr. Murphy's opinion was rendered outdated by Dr. Wehman's subsequent treatment of Anthony.  Anthony further argues that the ALJ erred by giving significant weight to Dr. Murphy's opinion, but failing to account for all limitations imposed by Dr. Murphy.

First, the medical records received after Dr. Murphy issued his residual functional capacity assessment did not render that opinion obsolete.  As the Third Circuit has noted, "because state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision."  Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011).  Consequently, a consultant's opinion is only rendered outdated when, in the ALJ's opinion, subsequent medical records would have altered the consultant's opinion.  Id. (quoting SSR 96-6p).

Although Dr. Murphy did not have access to Dr. Wehman's treatment records, these records did not render Dr. Murphy's opinion outdated.  Dr. Murphy had access to the medical records provided by Dr. Caruso, which detailed the early development of Anthony's mental impairments. Tr. 250-53, 262-64. Dr. Murphy

also had access to early medical reports from Stevens Center, which provided mental status examinations that were almost identical to later records from Dr. Wehman, and contained a GAF score of fifty, which was ten to twenty points lower than the GAF scores assigned by Dr. Wehman. Tr. 234-36, 416-18, 420-23. Dr. Murphy was also able to examine the report of Dr. Thomas, which detailed Anthony's learning disorder and mental capacity.  Tr. 218-21.

Furthermore, Dr. Wehman's treatment records do not contain information that significantly contradicts these earlier records.  Similar to earlier records from Stevens Center, Dr. Wehman's records document complaints of depression and anxiety, but also document normal speech, normal thought processes, and intact cognitive functioning. Tr. 234-36, 417-18, 420-23.  Dr. Wehman assigned GAF scores ranging from sixty to seventy, which were significantly higher than the GAF scores that Dr. Murphy had access to, which ranged from forty-five to fifty.  Tr. 235, 376, 416, 417, 418, 422.  Additionally, treatment notes that were obtained after Dr. Murphy rendered his opinion demonstrate an improvement in symptoms with medication, not a deterioration.  Tr. 373, 416-18, 443. Thus, Dr. Wehman's records would not have altered Dr. Murphy's opinion.

Second, the ALJ did adequately account for the entirety of Dr. Murphy's opinion.  Dr. Murphy opined that Anthony was moderately limited in his ability to sustain an ordinary routine without special supervision.  Tr. 388.  However, this

limitation must be read in context with the remainder of Dr. Murphy's opinion.

Dr. Murphy clarified that Anthony was capable of asking simple questions and

accepting instructions, as well as "perform[ing] repetitive work activities without

constant supervision." Tr. 390. Dr. Murphy believed that Anthony was capable of

completing a normal workweek without exacerbation of psychological symptoms,

and was capable of making simple decisions. Id. He concluded that Anthony "is

able to meet the basic mental demands of competitive work on a sustained basis

despite the limitations resulting from his impairment. Id.

Furthermore, "moderate" limitation is defined in the administrative record as

"able to function satisfactorily." Tr. 513. This is consistent with Dr. Murphy's

opinion that Anthony could engage in competitive work on a sustained basis, and

could maintain repetitive work without constant supervision. Tr. 390.

Additionally, the ALJ found that Anthony had only mild difficulties in his social

functioning, a conclusion that effectively rejects any limitations in Anthony's

ability to work without special supervision. See, McClain v. Astrue, No. CIV.A.

09-317-GMS, 2011 WL 2669216, at *6 (D. Del. July 7, 2011). Therefore, it is

clear from the entirety of Dr. Murphy's opinion that he did not believe Anthony

had a serious limitation in his ability to sustain competitive employment, and the

ALJ did not err in his treatment of Dr. Murphy's opinion.

### C.   Assessment of Anthony's Credibility

Lastly, Anthony challenges the ALJ's determination that his subjective complaints and symptoms of hypokalemia were not entirely credible. Tr. 19-20. An ALJ may discount a claimant's credibility so long as he or she articulates the reasons for that conclusion, and grounds that credibility determination in medical evidence. Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999). An ALJ's credibility determination is entitled to deference by the district court because "he or she has the opportunity at a hearing to assess a witness's demeanor." Reefer v. Barnhart, 326 F.3d 376, 380 (3d Cir. 2003).

Here, the ALJ found that Anthony's subjective complaints were not entirely credible and were undermined by several factors. Tr. 19. First, the ALJ noted that Anthony's activities of daily living belied his claims of severe functional restrictions. Id. In that vein, Anthony reported an ability to drive, even at times when he was suffering from low potassium. Tr. 45. Anthony was able to see his children off to school, make lunch, care for his hygiene, clean, perform household chores, cook dinner, and help his children with homework without any reported difficulties. Tr. 36-40, 162-64. Anthony only reported difficulty "at times" folding laundry when his potassium levels were low. Tr. 33. These activities generally contradict an inability to use one's hands or ambulate effectively.

Second, the ALJ noted that Anthony had been convicted of welfare fraud in the past, a crime that involves dishonesty or a false statement,[12] and believed this raised general credibility issues.  Tr. 20.  Despite Anthony's statement that the Department of Public Welfare simply lost his wife's pay stubs, the fact remains that he was convicted of this crime, tr. 35-36, and the ALJ could reasonably rely on this conviction to question Anthony's overall credibility.  See, Arguinzoni v. Astrue, No. 08-CV-6356T, 2009 WL 1765252, at *7 (W.D.N.Y. June 22, 2009); Carter v. Astrue, No. C10-999-TSZ-JPD, 2010 WL 5463093, at *5-6 (W.D. Wash. Dec. 7, 2010) report and recommendation adopted, No. 10-CV-999-TSZ, 2010 WL 5463258 (W.D. Wash. Dec. 29, 2010) aff'd, 472 F.App'x 550 (9th Cir. 2012).

Third, the ALJ found that Anthony's reported symptoms were not supported by the medical evidence of record.  Tr. 20.  As discussed previously, the medical evidence indicates that Anthony only suffered from one episode of hypokalemia during the relevant period, and blood tests revealed low potassium on two other occasions.  Tr. 291, 433, 474.  Consequently, medical records do not document an impairment that would result in the frequent physical limitations that Anthony described.

Additionally, Anthony's treatment for hypokalemia was conservative in nature, consisting entirely of supplements and prescription medications.  Tr. 205-

---

[12] See, United States v. Kross, 14 F.3d 751, 755 (2d Cir. 1994).

17, 239-90, 370-72, 424-55, 469-508.  One would expect to see a greater amount of treatment, or at least more aggressive treatment, if Anthony had experienced muscle weakness and an inability to use his extremities one to two times every two weeks as he stated.  Therefore, the record as a whole supports the ALJ's credibility determination, particularly in light of deference accorded to such decisions.

IV.   **CONCLUSION**

A review of the administrative record reveals that the decision of the Commissioner is supported by substantial evidence.  Pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner is affirmed.

An order consistent with this memorandum follows.


BY THE COURT:

s/Yvette Kane
Yvette Kane
United States District Judge


Dated: November , 2014